UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

RONNIE WAYNE RICKETTS, JR.,

        Petitioner,

        v.                              CAUSE NO. 3:20-CV-55-JD-MGG

WARDEN,

        Respondent.

OPINION AND ORDER

Ronnie Wayne Ricketts, Jr., a prisoner without a lawyer, filed an amended

habeas corpus petition to challenge his conviction for burglary under Case No. 82D03-

1702-F2-1230. Following a jury trial, on February 9, 2018, the Vanderburgh Superior

Court sentenced him to seventeen and a half years of incarceration.

FACTUAL BACKGROUND

In deciding this habeas petition, the court must presume the facts set forth by the

state courts are correct unless they are rebutted with clear and convincing evidence. 28

U.S.C. § 2254(e)(1). The Court of Appeals of Indiana summarized the evidence

presented at trial:

> On March 2, 2017, Maurice Huffman, Huffman's mother, James Smith,
> and Metcalf were eating dinner together in the dining hall at the
> Evansville Rescue Mission. There were "a lot" of children volunteering in
> the Rescue Mission that day. Metcalf had had sexual intercourse with
> Smith on a single occasion, and Ricketts, the father of Metcalf's infant
> daughter and with whom she had been romantically involved for
> approximately four years, had previously told Metcalf not to associate
> with Smith anymore. As the quartet was eating, Ricketts came into the
> hall, called Metcalf a "lying whore," and told Huffman and Smith that if

they did not leave her alone "[they] would be dead." According to Smith, Ricketts entered the hall; said "this is how it's f-ing going to be" to Metcalf; and told Smith and Huffman, "you are both going to die now."

Metcalf followed Ricketts outside as he retrieved two handguns from his vehicle. Despite Metcalf begging him to stop, Ricketts tried to reenter the Rescue Mission, and, when he discovered that he could not reenter through the door, shot out a window and stepped through. Smith ran to the kitchen and Huffman ran out the back door and hid behind a dumpster. Ricketts searched for Smith and Huffman without success, returned to his vehicle, and drove off. After a vehicular pursuit, police apprehended Ricketts in front of his home.

Ricketts told police after his arrest that he and Metcalf had been together for four years and that he had gone to the mission to see if she was lying to him. Ricketts told an interviewer that "[t]he first time when I went in, and I seen her with 'em, and I got pissed. I went back out to the truck got [the handguns]. They shut me out with the door—the wooden doors, so I shot the window out. I didn't shoot at nobody. I didn't hurt nobody. I shot the window out. Kick—pushed it through, and went through it and went after 'em."

The interviewing detective asked Ricketts if he told both Smith and Huffman that he was going to kill them, to which Ricketts responded, "You're damn right I did." When the detective asked, "if you would have found them would you have shot them?", Ricketts replied, "Oh, yeah." The detective then asked or stated, "You–you wanted to kill them," to which Ricketts replied, "Yeah." On March 6, 2017, the State charged Ricketts with Level 2 felony burglary.

* * *

The case proceeded to trial on January 8 and 9, 2018, after which the jury found Ricketts guilty as charged.

On February 9, 2018, the trial court held a sentencing hearing. The trial court found Ricketts's basically-law-abiding life before the instant offense to be mitigating. The trial court found the facts and circumstances of the offense to be aggravating and sentenced Ricketts to the advisory term of seventeen and one-half years of incarceration.

ECF 23-3 at 2-8; *Ricketts v. State*, 108 N.E.3d 416, 420 (Ind. App. 2018).

In the petition, Ricketts argues that he is entitled to habeas relief because the trial court deprived him of his right to represent himself and because he received an excessive sentence of incarceration.

## STANDARD OF REVIEW

"Federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (quotations and citation omitted).

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> [This] standard is intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Woods*, 135 S. Ct. at 1376 (quotation marks and citations omitted). Criminal defendants are entitled to a fair trial but not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must

be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation marks omitted).

ANALYSIS

Right to Self-Representation

Ricketts argues that he is entitled to habeas relief because the trial court deprived him of his right to self-representation by denying his request to proceed to trial without counsel. A criminal defendant "has a constitutional right to proceed [to trial] without counsel when he voluntarily and intelligently elects to do so." *Martinez v. Ct. of App. of California, Fourth App. Dist.*, 528 U.S. 152, 154 (2000). Nevertheless, "the Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so." *Indiana v. Edwards*, 554 U.S. 164, 177–78 (2008). "That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Id.*

On December 4, 2017, at a pretrial conference, the trial court and Ricketts discussed Ricketts' request to proceed to trial without counsel as follows:

> **The Court:** Okay, you do not want [trial counsel] to represent you?
>
> **Ricketts:** No, sir.
>
> **The Court:** Okay, do you want to tell me why?

**Ricketts:** Not really a reason. Just that she hasn't been doing nothing. I've been in here for nine months. I've had a heart attack, and my health issues are pretty bad, and my other stuff's going on.

**The Court:** Okay.

**Ricketts:** I don't think she's been doing what she should do to try and get me out.

**The Court:** Well, it's not up to her whether you get out. That's up to the court. Have you ever represented yourself before?

**Ricketts:** No, sir. This is the first time I've ever been in jail.

**The Court:** Okay. Do you have any familiarity with the rules of evidence of the trial procedures, court procedures, anything like that?

**Ricketts:** Not really. We got the law books in here though.

**The Court:** Do you understand that it's almost always unwise to represent yourself?

**Ricketts:** Yes, like I said, it's my first time, sir.

**The Court:** Okay. That throughout the trial, the State of Indiana will be represented by an experienced legal counsel. I'm not sure in your case who that will be, but someone who has legal training. And the court will be required, as a matter of law, to hold you to the same standards. I can't let you violate rules of evidence or trial procedure or anything in that nature. You're going to have to present your case according to the law. You understand that?

**Ricketts:** Yes, sir.

**The Court:** That I can't give you any other special indulgence. I can't change your sentence because you represented yourself. You can't get a more serious sentence, but you also can't get a lesser sentence. Do you understand that?

**Ricketts:** Yes, sir.

**The Court:** Lawyers have been trained on how to question witnesses, cross-examine witnesses, gather evidence, identify evidence that might be harmful or illegally obtained by the government, and move to suppress or exclude evidence in ways that I'm pretty confident you're not capable of right now. Do you understand that?

**Ricketts:** Yes, sir.

**The Court:** Have you even been found mentally incompetent for any reason?

**Ricketts:** I got out of the military on mental health issues.

**The Court:** Generally speaking, what were they?

**Ricketts:** Depression, personality disorder, PTSD.

**The Court:** Do you currently take medication for that?

**Ricketts:** Yes, sir. I've been seeing a psychiatrist off and on for twenty years. But I've also been seeing them at the VA for the last six years.

**The Court:** Okay.

**Ricketts:** On a regular basis.

**The Court:** Alright, does any of that medication interfere with your thinking?

**Ricketts:** It's hasn't been helping, the stuff I've been taking. I told my therapist before this happened that my medicine wasn't working, and I was needing to get something stronger, and then this happened.

**The Court:** Okay.

**Ricketts:** Also on pain medication and about six other different medications. Anxiety medication and stuff like that too.

**The Court:** Is that going to interfere with your ability to represent yourself? Concentrate on the case? Do the researched that's necessary? Look up the relevant law and facts?

**Ricketts:** It could, sir. I'm not for sure. Like I said, I've never had to do anything like this before.

**The Court:** Well, if there's a possibility that that's going to interfere, how are you going to do that if you're representing yourself?

**Ricketts:** I have no idea, sir.

**The Court:** Okay.

**Ricketts:** I will just have to do the best I can.

**The Court:** How far did you go in school?

**Ricketts:** I graduated high school and took a couple years of automotive school at Ivy Tech College.

**The Court:** And how long were you in the army?

**Ricketts:** I was Army military police for three years before I got out on the medical, and then I got back and went into the Indiana National Guard for six years and got out in 2004.

**The Court:** Have you ever seen a final argument or an opening statement given in a criminal case?

**Ricketts:** We did it in high school once, sir. It's been a while back.

**The Court:** Have you ever been in a courtroom for any reason?

**Ricketts:** No, sir.

**The Court:** Alright, I'm going to deny your request, Mr. Ricketts. I'm not confident you can represent yourself adequately. You're entitled to a fair trial. It's been my experience that most people who represent themselves just screw up their case big time. That, generally speaking, would not be enough. If that was all there was to it, I'd probably let you go ahead and represent yourself, but the mental problems, the emotional issues, those kinds of things will intensify the pressure as a trial gets closer. Trials are immensely nerve-wracking experiences for everyone involved and that will not help whatever mental condition or emotional problems that you are suffering from. I'm afraid that you might, for lack of a better term, come undone during trial and then end up saying or doing something that

would devastate your case. Let me tell you, [trial counsel] is a trained legal advocate. She has been a member of the bar here for a while. She practices in this court routinely. She's extremely competent, works very diligently and very hard for her client. The problems you're experiencing come from the fact that the public defender's office is overwhelmed by their caseload. That is the number of cases they're required to handle compared to how many public defendants there are. Not by the lack of diligence on their part or any lack of effort to represent their clients to the best of their ability. That's a fact that she can't change, I can't change, no one can change. That's a fact that we're just all stuck with. I understand the dissatisfaction from your point of view, but I think your interest would be best served by keeping a well-trained competent legal counsel to represent you in this case. You have that, and I'm not going to make a change at this time. You have a January 8 trial date as it stands right now. It's highly likely that case will go to trial on that day, and so, by the end of that week, there will be a resolution of your case one way or the other. I believe that [trial counsel] has been working on the case. She has been at a couple pretrial conferences with this court and with the prosecuting attorneys assigned. There's been a number of discussions about your case and pretty thorough discussions of your case really. I think she understands the legal issues presented by your case and the factual interests presented by your case. And the mere fact that she may not have had sufficient time to deal with it as you would like is understandable from your point of view, but that's not something she or I can do anything about so, we're going to show the trial date is affirmed for January 8 and she is going to remain your legal counsel for now.

ECF 45-2 at 22-28.

On direct appeal, the Indiana Court of Appeals rejected Ricketts' argument regarding self-representation, reasoning that Ricketts' testimony supported the trial court's finding that Ricketts was not competent to conduct trial proceedings on his own due to severe mental illness. ECF 23-3 at 8-10. After reviewing the State court record, the court cannot find that the State courts reached an unreasonable determination on the right to self-representation claim. Ricketts told the trial court that he suffered from various mental illnesses that medication did not adequately address and that could

8

affect his ability to represent himself. Ricketts further implied that these illnesses caused the incident at the rescue mission that is the subject of this case, which involved threats of violence and the use of a firearm. Despite further inquiry, the trial court could not determine that Ricketts' mental condition would not impede his ability to conduct trial proceedings. Given Ricketts' testimony at the pretrial conference, the State courts had an ample basis to support their conclusion that Ricketts was not competent to conduct trial proceedings on his own.

One might question the State court's reliance on Ricketts' representations regarding his mental capacity to the exclusion of any medical evidence, but Ricketts identifies no Supreme Court case holding that such evidence is required for trial courts to deny the right of self-representation as required by 28 U.S.C. § 2254(d)(1), and federal appellate courts have upheld applications of *Edwards* that do not rely on medical evidence on a handful of occasions. *See e.g., Jordan v. Hepp*, 831 F.3d 837 (7th Cir. 2016); *U.S. v. Arnold*, 630 Fed. Appx. 432 (6th Cir. 2015); *U.S. v. Carradine*, 621 F.3d 575 (6th Cir. 2010). One might also disagree that Ricketts' violent reaction as a result of seeing his girlfriend with another man implies that a similar reaction––"come undone"––would occur at trial if Ricketts was allowed to proceed without counsel given the trial court's express advice regarding the consequences. Nevertheless, the operative question here is whether the State court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Applying this

demanding standard, the court cannot conclude that absence of medical evidence and the reliance on Ricketts' prior violent behavior under materially dissimilar circumstances rendered the State court determination unreasonable.

An overview of the relevant jurisprudence may be helpful in understanding the court's conclusion. The Seventh Circuit Court of Appeals has considered the application of the seminal case, *Indiana v. Edwards*, 555 U.S. 164 (2008), in the context of federal habeas review under Section 2254 on four occasions. First, in *Imani v. Pollard*, 826 F.3d 939 (7th Cir. 2016), the following occurred:

> Before trial, Imani's lawyer moved to suppress the driver's identification, arguing that it had been tainted by a television news report about the robbery. After the court denied the motion, Imani invoked his right to represent himself. He said he was not satisfied with his lawyer, who had not shown a recording of the television news report to the driver at the suppression hearing. Imani said his lawyer representation of him at the hearing gave him doubts about the lawyer's ability to represent him "well enough" at trial. Imani also said he was not satisfied with his lawyer's efforts to investigate the fingerprint evidence against him. Imani acknowledged that he might not be as "eloquent in speech" as his lawyer, but he said he had "been dealing with this case for over a year now" and knew how to express himself well. Imani added, "ain't nobody going to represent myself better than me."
>
> After Imani explained his reasons for choosing to represent himself, the judge asked: "What do you want to say to me to convince me that you're competent to represent yourself?" Imani said he had been "working on this for 13 months," but the judge dismissed Imani's work on his case as "irrelevant and unconvincing." The judge then directed Imani to focus on his "formal education." Imani said that he had a tenth-grade education, that he read at a college level, and that he had appeared in court for at least five previous criminal matters, although he was represented by lawyers in those cases.
>
> The judge said Imani could not represent himself, treating the matter as a request that required the judge's permission. The judge said that Imani did not have a "sufficiently rational basis" to justify his decision. He

> described Imani's decision as "a flippant short term or immature decision"
> that should not be given effect, and he described Imani's reasons for
> wanting to represent himself as "episodic driven," stemming from his loss
> of the suppression motion. The judge also cited the need to keep the trial
> on schedule and the increased difficulty of preparing for what he then
> expected to be a two-defendant trial. At that time, however, there were
> still four weeks until the trial was scheduled to begin, and Imani said that
> he had no problem with the trial date.

*Id.* at 942-43. On appeal of the federal habeas case, the Seventh Circuit found that the

Wisconsin court had unreasonably denied Imani, who was competent to stand trial, the

right to self-representation based on the determination that Imani's assertion of the

right was irrational and that Imani lacked the requisite legal experience. *Id.* at 943-47.

The Seventh Circuit observed that *Edwards* allowed courts to deny the right of self-

representation to criminal defendants who were competent to stand trial if they

suffered severe mental illness that prevented them from representing themselves at

trial. *Id.* However, the Seventh Circuit found that *Edwards* did not apply to Imani

because the record contained no indication that Imani suffered mental illness or

impairment and because Imani was able to engage in reasoned conversations with the

trial judge. *Id.*

One month later, the Seventh Circuit considered the case of *Jordan v. Hepp*, 831

F.3d 837 (7th Cir. 2016), which it characterized as a companion case to *Imani*. In that

case, the following occurred:

> While [a pretrial] hearing was underway, Jordan asked the court to do one
> of three things: appoint new counsel, delay the trial to allow Bohach to
> conduct further research, or allow Jordan to represent himself. The court
> immediately rejected the first two options, but it engaged in an extended
> colloquy with Jordan about the third.

The court first canvassed Jordan's background and experience. Jordan stated that he had an eighth-grade education, but only a fourth-grade reading ability. He had experience with being charged, but not with a trial. He confirmed that he understood the elements of the charges against him and correctly recited the potential sentence if convicted. He also said that he understood his constitutional right to counsel and the role of counsel—including the fact that if he were to represent himself, his stand-by counsel could not make his case for him. He acknowledged that without counsel, he would not know to make certain legal arguments, including objections to evidence or jury instructions. The court then ruled that he was competent to waive counsel and allowed him to do so. It commented that Jordan "certainly appears to me to be of average capability generally" and that he "seems alert and reasonably bright and [to] have some general understanding of what's going on here." While the court expressed concern about Jordan's limited literacy, it stated "that at least under the circumstances of this case, which is ultimately a factual case and not a document's [sic] case, that that limitation should not prevent him from representing himself."

We would not be here if matters had rested there. But they did not: later that day, the court reconsidered. It returned to the interrupted evidentiary hearing, this time with Jordan representing himself. During the hearing, the court reviewed a police report. This prompted it to worry that Jordan's limited literacy would prevent him from using documents provided in discovery, including police reports, "in any meaningful way at trial." After discussing the documents and taking a recess to allow Jordan to read some documents on his own, the court asked Jordan to read a document aloud and explain whether he understood it. Jordan responded that he only "somewhat" understood it, but that he was not concerned by this because his theory of defense did not depend on any documents. In fact, he told the court, he had already written down the questions that he wanted to ask of various witnesses. The court was not reassured and decided that it had to reverse its earlier ruling. It explained that given Jordan's limited literacy and education, he would "not [be] able to effectively represent [himself] and present a meaningful defense in this case." While Jordan was "competent to proceed to trial," he was "not competent to represent [himself] in a case of this nature" and so it ordered Bohach to represent Jordan at trial.

*Id.* at 841-42.

The Seventh Circuit disagreed with the Wisconsin court's decision. *Id.* at 842-46.
It cited statistics that about one-seventh of the national population could not read and
more than one-fifth of the national population could not read at a fifth-grade level. *Id.*
then reasoned that the Supreme Court in *Edwards* did not express concern about such a
large portion of the population but instead contemplated mentally ill or impaired
persons unable to handle matters on their own and required counsel "almost in the
capacity of a guardian." *Id.* Nevertheless, the Seventh Circuit recognized that the
operative habeas standard did not allow it to substitute its independent assessment of
the case but required it to decide whether the Wisconsin court's decision was
unreasonable. *Id.* The Seventh Circuit noted that the Wisconsin court did not revoke
self-representation merely because Jordan was unfamiliar with the law or unable to
make strategic decisions but because he would have been forced to engage with
documentary evidence that he could not read. *Id.* The Seventh Circuit also found that
the Wisconsin court did not reach an "unreasonable determination of the facts in light
of the evidence" by finding that his inability to read the documentary evidence would
materially harm his ability to defend himself despite Jordan's assertion to the contrary.
*Id.*

On January 31, 2017, the Seventh Circuit considered *Tatum v. Foster*, 847 F.3d 459
(7th Cir. 2017). After a psychiatrist found Tatum to be competent to understand court
proceedings and characterized him as likely to be "an extremely challenging
defendant," the trial court engaged in the following colloquy with Tatum:

**The Court:** I understand he wants to represent himself. What's your educational background, sir?

**Tatum:** I'm self-educated. I went to public school up until the tenth grade after which time I attended home school and—

**The Court:** Have you got a GED or HSED?

**Tatum:** I would say I have the equivalent of an HSED.

**The Court:** Do you have one?

**Tatum:** No, sir.

**The Court:** A formal one?

**Tatum:** No, sir. I can easily obtain it. That hasn't been my main goal. My main goal when it comes down to getting paper to prove it, I mean that's less of a goal for me at least at this point in my life, but I've been studying as far as the statutes, Wisconsin statute, studying representation for court proceedings. I have a good working knowledge of how court proceeding work.

**The Court:** Tell me about that. How does a trial work, sir?

**Tatum:** I mean, basically like I say, there's opening statements. You mean as far as proceedings before trial?

**The Court:** During trial.

**Tatum:** At the trial beginning?

**The Court:** Yeah.

**Tatum:** Basically opening statements.

**The Court:** What happens right before opening statements?

**Tatum:** I guess both parties states their appearance and things like that.

**The Court:** How do we get a jury?

14

**Tatum:** You do voir dire.

**The Court:** How does that work?

**Tatum:** You question—you question jurors, potential jurors—

**The Court:** About what?

**Tatum:** About various things.

**The Court:** What are we looking for in jurors?

**Tatum:** Fair people who are giving a fair determination as far as hearing evidence, not making biased decisions, make decisions based on the evidence that's presented, not their own personal beliefs as far as, you know, bias and things like that.

You have a certain amount of strikes, preemptory and strikes for cause. You got strikes for cause and if I had—I wasn't incarcerated at the facility where I had proper legal access I would be more prepared, I could prepare adequately. If I wasn't harassed in the jail I could prepare a lot better that way.

The judge asked Tatum how he would go about representing himself.

**The Court:** What kind of difficulties would you imagine that you would have in self-representation?

**Tatum:** You mean like my present circumstances?

**The Court:** In your present circumstances.

**Tatum:** Mainly the impairment based on the jail circumstances as far as them not providing me with reasonable access to the courts and legal materials.

Tatum and the judge then discussed how Tatum would go about investigating the case. Tatum said he would continue doing "what I've been doing all along," by making phone calls and gathering evidence. The colloquy then continued:

**The Court:** What are you charged with, sir?

**Tatum:** Two counts of first-degree intentional homicide.

**The Court:** What's the penalty — and two counts of what?

**Tatum:** Use of a dangerous weapon.

**The Court:** What's the penalty?

**Tatum:** Class A felonies carry the maximum of life in prison.

Finally, the court summarized the holding of *State v. Klessig*, 211 Wis.2d 194, 564 N.W.2d 716 (1997),[1] and concluded:

> **The Court:** . . . He's made the choice, there's no question about it. He's aware of the seriousness of the charges. He's aware of the general range of penalties but he is not aware of the difficulties and disadvantages of self-representation especially given his circumstances, and given the fact that he's only got a tenth-grade education therefore I deny his right to represent himself.

*Id.* at 461-63. The Seventh Circuit found that the Wisconsin court's determination was unreasonable because it "strayed from the 'mental functioning' sense of competence over to educational achievement and familiarity with the criminal justice system." *Id.* at 464-68. The Seventh Circuit observed that the colloquy included nothing to suggest that Tatum suffered from deficient mental functioning even broadly construing that term to include illiteracy as in *Jordan*. *Id.*

The Seventh Circuit most recently examined *Edwards* in *Washington v. Boughton*, 884 F.3d 692 (7th Cir. 2018). In that case, the following occurred:

---

[1] In *State v. Klessig*, 564 N.W.2d 716 (Wis. 1997), the Supreme Court of Wisconsin held, "To prove such a valid waiver of counsel, the circuit court must conduct a colloquy designed to ensure that the defendant: (1) made a deliberate choice to proceed without counsel, (2) was aware of the difficulties and disadvantages of self-representation, (3) was aware of the seriousness of the charge or charges against him, and (4) was aware of the general range of penalties that could have been imposed on him." *Id.* at 722.

Washington was appointed counsel. During pre-trial proceedings, Washington expressed dissatisfaction with his counsel's performance and told the court that he wanted to represent himself. Four months before trial, he filed a written submission stating that unless his lawyer moved to dismiss the case prior to a hearing scheduled for February 14, 2008, he would seek to proceed pro se. True to his word, Washington told the court at that hearing, "I just want to go pro se in this case and defend myself." Although he withdrew his request the same day after conferring with his counsel, he revived it on the morning of April 28, 2008—the day his trial was scheduled to begin—insisting, "I'm going pro se in this case, Your Honor."

The court confirmed that Washington wished to represent himself, prompting the following colloquy:

> **The Court:** Okay. But you understand that by doing so you would have to comply with any and all the rules of the court and rules of evidence and case law, do you understand that?
>
> **Defendant:** I have no problem with that.
>
> **The Court:** Well, do you know the rules of evidence, sir?
>
> **Defendant:** Do I what?
>
> **The Court:** Know the rules of evidence?
>
> **Defendant:** When they are brought to my attention, I will know.
>
> **The Court:** So that would certainly help to have a lawyer help you do that.
>
> **Defendant:** It won't be this one.
>
> **The Court:** Well, here is the problem with proceeding pro [se] like you want to, and you have a right to do that unless the court doesn't feel that you're competent to do that and the court doesn't believe that you're competent to do that and I'll tell you why, because of the DNA. The DNA that's involved in this case which is scientific and very few people outside the legal profession and scientists know how that works. And in order to develop and cross-examine those witnesses, you have to have some knowledge in doing that. Even if you knew some of the rules of evidence and were capable in other

> ways in order to represent yourself, that's a big issue. And it
> becomes problematic, also problematic also since this is a sexual
> assault case for you to quite frankly cross-examine the witnesses.
>
> **Defendant:** I have a right to face my accusers.
>
> The judge denied Washington's request, and the case proceeded to trial
> with Washington represented by a lawyer he didn't want.

*Id.* at 695–96. On direct appeal, the Wisconsin court affirmed the conviction based

primarily on Washington's inability to comprehend the DNA evidence that formed a

substantial portion of the prosecution's case against him. *Id.* at 701-02. The Seventh

Circuit reiterated that *Edwards* did not allow courts to deny the right of self-

representation based on "perceived lack of education, experience or legal knowhow."

*Id.* at 702-04. It detailed *Imani* and *Tatum*, which were unreasonable applications of

*Edwards* as well as *Jordan*, which was not. *Id.* The Seventh Circuit found that

Washington's claim fell squarely on the *Imani-Tatum* side of the dichotomy because

Wisconsin did "not suggest that Washington suffers from any mental illness or

disability, or that the state courts' denial of his right to self-representation rested on the

belief that he did." *Id.*

Unlike in *Imani*, *Tatum*, and *Washingto*n, where the trial courts made no inquiry

into the mental state of the defendant, the State court denied Ricketts the opportunity to

conduct trial on his own based on the good faith belief that Ricketts suffered from

mental illness or disability. Indeed, Ricketts' claim is weaker than even the *Jordan* claim

given the undisputed facts that depression, personality disorder, and post-traumatic

stress disorder are mental illnesses and given that Ricketts conceded that he had these

mental illnesses, that they could have impeded his ability to conduct trial on his own, and that he had "no idea" how he would overcome such challenges. Therefore, the instant case aligns with *Jordan* where the defendant's problem due to near-illiteracy "went well beyond the lack of knowledge of court procedure or an ability to make strategic judgments." *Jordan*, 831 F.3d at 845. The Seventh Circuit noted that "[t]he fact that the Supreme Court itself recognized that certain forms of mental disability deserved special consideration suggests that the approach of the Wisconsin courts was not so utterly without support that it cannot stand." *Id*. So too here, Ricketts' problems went beyond his lack of lawyerly skills. In fact, the state judge observed that, had that been his only obstacle, he would have allowed him to proceed pro se. The real trouble was Ricketts' mental condition which the state judge thought prevented him from putting on a defense without assistance of counsel. *Cf. Jordan*, 831 F.3d at 845 ("The state court thought that Jordan could not put on a defense without another person's assistance, and that other person had to be a member of the bar.") And like the court in *Jordan*, this Court also feels "compelled by AEDPA to hold that this was not an unreasonable interpretation of *Faretta* and *Godinez*, and thus neither contrary to those decisions nor an unreasonable application of their holdings." *Jordan*, 831 F.3d at 845.

Based on the foregoing, the court finds that the State court's decision on this claim is not unreasonable, and the claim that Ricketts was denied the right to self-representation is not a basis for habeas relief.

<u>Excessive Sentence</u>

19

Ricketts argues that he is entitled to habeas relief because the trial court considered only aggravating circumstances at sentencing. As an initial matter, the assertion that the trial court considered only aggravating circumstances is not supported by the record. At sentencing, the trial court considered one aggravating circumstance and one mitigating circumstance and explained the sentencing decision as follows:

> The legislature has said that the standard sentence in a case like this is seventeen and a half years. I think that is appropriate here. I think the mitigating circumstance is that you've led basically a law abiding life for your whole life until this day is balanced out by the absolute terror that was inflicted by your actions.

ECF 45-3 at 65-66.

On direct appeal, Ricketts challenged his sentence only under State law, and the Indiana Court of Appeals affirmed the sentencing decision, agreeing with the trial court's identification and balancing of the aggravating and mitigating factors in their entirety. ECF 23-3 at 11-13. Because Ricketts challenged his sentence only under State law, he cannot obtain habeas relief on this claim because it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. *Washington v. Boughton*, 884 F.3d 692, 701 (7th Cir. 2018) ("Because that conclusion rests on an interpretation of state law, it is iron-clad on habeas review.")

## CERTIFICATE OF APPEALABILITY

Pursuant to Section 2254 Habeas Corpus Rule 11, the court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional

right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this order, there is no basis for encouraging Ricketts to proceed further.

For these reasons, the court DENIES the amended habeas corpus petition (ECF 5); DENIES a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and DIRECTS the clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on March 22, 2022

/s/JON E. DEGUILIO
CHIEF JUDGE
UNITED STATES DISTRICT COURT